IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CRYSTAL LOCKE,

Plaintiff,

v.

CHICAGO FAMILY HEALTH
CENTER,

Defendant.

Case No. 23-cv-4650

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Crystal Locke ("Plaintiff") has sued Chicago Family Health Center ("CFHC") for one count of religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and one count for failure to accommodate her religious beliefs under Title VII. Before the Court now is CFHC's motion for summary judgment on both counts. For the reasons stated below, CFHC's motion for summary judgment [112] is granted in part.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND

### I. Local Rule 56.1

"Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019).

*See also Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014) ("We have frequently said that it is within the district court's discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required.").

If a party disputes an asserted fact, the "party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." *Noe v. Smart Mortg. Centers, Inc.*, No. 1:21-CV-01668, 2024 WL 4346562, at *2 (N.D. Ill. Sept. 29, 2024) (quoting L.R. 56.1(e)(3)). "[M]ere disagreement with [] asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Both parties have failed to comply with Local Rule 56.1. As to CFHC, while it disputes paragraph 1 of Plaintiff's Local Rule 56.1 statement, it does not cite any "specific evidentiary material" to support that dispute. L.R. 56.1(e)(3)). And as to Plaintiff, though she disputes paragraphs 3, 9, 11–13, 16–17, 23, 27, 29, 32, 34–38, 41–42, 45–46, and 50–51 of CFHC's Local Rule 56.1 statement, she likewise fails to identify any supporting evidentiary material. As a result, the Court accepts those paragraphs as true and uncontested to the extent they are supported by the record. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).

To be sure, Plaintiff's failure to comply with Local Rule 56.1 is far more egregious than CFHC's failure. Nevertheless, Plaintiff's non-compliance is not a basis for

automatically granting CFHC's motion. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). Rather, the Court is mindful that the moving party has the "ultimate burden of persuasion" to show entitlement to judgment as a matter of law. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). The Court will apply these standards in evaluating the evidence.

## II.    Factual Background

CFHC is a community health center that provides an array of primary health care services to underserved communities. [114] ¶ 4. CFHC has six locations in the Chicagoland area. *Id.* ¶ 2.

On February 15, 2021, CFHC hired Plaintiff as Director of Care Management for CFHC's South Chicago clinic. *Id.* ¶ 6. In that role, Plaintiff was responsible for leading the Care Management Department and supervising 38 to 40 employees. *Id.* ¶¶ 7, 8. Plaintiff was also responsible for implementing CFHC's care management strategy to ensure that patients with the most needs were provided with the most assistance. *Id.* ¶ 7. Plaintiff never directly interacted with patients in her role. [114-5] at 13:10–12.

When Plaintiff was hired, she worked a hybrid schedule, requiring her to be physically in-person approximately two to three days per week. *Id.* ¶ 15. There is conflicting evidence on whether Plaintiff could have effectively performed her job completely remotely. CFHC presents testimony that Plaintiff could not have worked fully remote, as it was necessary for her to interact directly with her staff. [114-5] at 12:17–13:9; 42:19–24; [114-7] at 36:12–19. Plaintiff, on the other hand, presents

testimony that she could have performed her job duties exactly the same at home. [114-3] at 55:16–58:2.

On August 20, 2021, due to the COVID-19 pandemic, CFHC informed its employees that it would be implementing a COVID-19 vaccine policy ("Vaccine Policy") for the safety of patients and employees. [114] ¶¶ 18, 21. The Vaccine Policy required employees to be fully vaccinated against COVID-19 by September 5, 2021. *Id*. ¶ 21. Employees, however, could request an accommodation and exemption from the Vaccine Policy for medical, religious, or pregnancy-related reasons. *Id*.¶ 22.

On September 17, 2021, Plaintiff submitted a religious accommodation request from the Vaccine Policy. *Id*. ¶ 25. In her request, Plaintiff wrote that "[m]y teachings reveal my body is a temple created by the most high God; who knows what I have need of, knows the very numbers of hair on my head; is a healer, protector, and provider." *Id*. At her deposition, Plaintiff elaborated that she has been a Christian since the second grade and the basis for her refusing to be vaccinated was her belief that "injecting or allowing someone to inject something foreign into me to prevent me from possibly not catching something when my belief is that God is my creator, my healer." *Id*. ¶¶ 26, 28. She also noted that she did not want to receive a COVID-19 vaccine because "medically, you know, my immune system is created to heal itself." *Id*. ¶ 30. Plaintiff further explained that "manmade" substances, as opposed to natural medicine, conflicted with her religious beliefs as those substances "would be introduced into the body … to help with the immune system that God already created." *Id*. ¶ 31.

On September 27, 2021, CFHC granted Plaintiff's religious accommodation request. *Id*. ¶ 27. As with other employees that were granted accommodations, Plaintiff was required to undergo weekly testing for COVID-19, wear personal protective equipment ("PPE"), and follow social distancing guidelines. *Id*. ¶ 24.

In early 2022, due to the Omicron variant of COVID-19, CFHC decided it could no longer accommodate individuals from not receiving a COVID-19 vaccine. *Id*. ¶¶ 36, 44. CFHC's decision was based on its belief that vaccination against COVID-19 resulted in less serious cases of COVID-19 and that, as a health provider, it had an obligation to protect patients and employees from illness. *Id*. ¶¶ 39, 41. CFHC utilized Centers for Disease Control and Prevention, National Institute of Health, U.S. Department of Health, State Department of Health, and Chicago Department of Health guidelines to make its determination. *Id*. ¶ 40. CFHC's decision to stop accommodating individuals applied to all employees, regardless of the reason for the exemption. *Id*. ¶ 37.

On March 25, 2022, Plaintiff was notified that CFHC was no longer accommodating exemptions to its Vaccine Policy, and that she had until May 1, 2022 to become vaccinated or her employment would be terminated. *Id*. ¶ 44. Nevertheless, Plaintiff still refused to receive a COVID-19 vaccine. *Id*. ¶ 43.

On May 1, 2022, Plaintiff and all other CFHC employees who refused to receive a COVID-19 vaccine were terminated. *Id*. ¶¶ 46–49. Plaintiff's position was later filled by Theresa Sykes-Duhart ("Sykes-Duhart"). *Id*. ¶ 52. Unlike Plaintiff, Sykes-Duhart had received a COVID-19 vaccine. *Id*.

6

After May 1, 2022, two CFHC employees who were terminated for not receiving a COVID-19 vaccine—Nkosazana Mahan ("Mahan"), CFHC's former Senior Clinic Manager and Interim Chief Operating Officer and Karen Laws ("Laws"), CFHC's former Director of Revenue Cycle—were retained as consultants to transition their respective responsibilities to other individuals. *Id*. ¶¶ 47, 49. Mahan and Laws held unique roles within CFHC's organization and CFHC did not have anyone else on its staff who could assume their duties in such a short period of time. *Id*. ¶¶ 50, 51. Still, because they refused to receive a COVID-19 vaccine, neither Mahan nor Laws were permitted to continue their respective positions as full-time, regular employees. *Id*. ¶ 51.

## ANALYSIS

CFHC argues that it is entitled to summary judgment on Plaintiff's religious discrimination claim (Count I) because (1) Plaintiff has not articulated a religious belief that prevented her from receiving a COVID-19 vaccine, (2) Plaintiff cannot show that she was treated less favorably than other similarly situated employees outside her protected class, and (3) Plaintiff cannot rebut CFHC's legitimate, non-discriminatory reason for her discharge. CFHC also argues that it is entitled to summary judgment on Plaintiff's failure to accommodate claim (Count II) because (1) Plaintiff has not articulated a religious belief that prevented her from receiving a COVID-19 vaccine, and (2) Plaintiff's accommodation request would have imposed an undue hardship on CFHC. The Court addresses each claim in turn.

### I. Count I: Religious Discrimination

In a Title VII discrimination case, to survive summary judgment, "a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018) (cleaned up). A plaintiff can meet this burden by introducing direct evidence of discrimination or, alternatively, by utilizing the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016) (citing *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 880 (7th Cir. 2016)). Once the plaintiff makes a *prima facie* case, "the burden shift[s] to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citation and quotations omitted). If a plaintiff cannot prevail using the *McDonnell Douglas* method, she can still defeat summary judgment if the evidence "as a whole" "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760,

765 (7th Cir. 2016); *see also David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Here, Plaintiff offers no direct evidence of discrimination based on her religion. Therefore, to survive summary judgment, Plaintiff must proceed under the *McDonnell Douglas* framework or holistic approach. The Court will first evaluate whether the evidence of discrimination satisfies the *McDonnell Douglas* framework. The Court will then consider the evidence holistically.

Before proceeding, however, the Court addresses CFHC's argument that because Plaintiff cannot identify any religious belief that prohibited her from receiving a COVID-19 vaccine she cannot establish a *prima facie* case of religious discrimination. [113] at 13. Though this argument is relevant to Plaintiff's failure to accommodate claim, *see infra* § II, it does not apply to Plaintiff's religious discrimination claim. Failure to accommodate claims and religious discrimination (or intentional discrimination[1]) claims employ different analytical frameworks. *Porter v. City of Chicago*, 700 F.3d 944, 951–955 (7th Cir. 2012); *see also Kluge v. Brownsburg Cmty. Sch. Corp.* (*Kluge I),* 64 F.4th 861, 925 n.7 (7th Cir. 2023) (Brennan, J., concurring in part) ("A different version of the [*McDonnell Douglas*] burden-shifting framework applies to failure-to-accommodate cases, as opposed to retaliation or disparate

---

[1]The Seventh Circuit has referred to these claims as "disparate treatment" claims. The Supreme Court, however, has noted that a claim that an employer failed to accommodate an employee's religious beliefs is just a certain type of disparate treatment claim. *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773–775 (2015). Regardless of the label used, the analytical framework differs between intentional discrimination claims and failure to accommodate claims.

treatment cases."). In failure to accommodate actions, the focus is whether an employer made a "reasonable accommodation" of an employee's specific "religious practice." *Porter*, 700 F. 3d at 951. By contrast, the focus in religious discrimination actions is whether an employer "discriminat[ed] against an employee on the basis of the employee's religion." *Id.* at 954. Identification of specific religious beliefs, while helpful for determining an employee's membership in a religious group (*i.e.*, membership in "a protected class"), are not by themselves a requirement to establish a *prima facie* case of religious discrimination. *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (listing elements of a *prima facie* case).

CFHC cites[2] no authority for the proposition that a plaintiff must identify a specific religious practice to make out a *prima facie* case of religious discrimination. Nor has the Court identified any such authority. As such, the Court will not consider CFHC's arguments regarding Plaintiff's failure to identify a specific religious belief that prohibited her from receiving a COVID-19 vaccine in its analysis of Plaintiff's religious discrimination claim.

### a. Plaintiff Cannot Satisfy the *McDonnel Douglas* Standard

CFHC does not dispute that Plaintiff has satisfied the first three elements of the *McDonnell Douglas* framework. CFHC instead focuses on the final element and

---

[2]CFHC cites *McCadd v. Kraft Heinz Co.*, No. 22-CV-07096, 2025 WL 660812 (N.D. Ill. Feb. 28, 2025); *Brown v. Cook Cnty. Auditors Off.*, No. 23-CV-10452, 2024 WL 3426888 (N.D. Ill. July 16, 2024), *Hassett v. United Airlines, Inc.*, No. 23 C 14592, 2024 WL 1556300 (N.D. Ill. Apr. 10, 2024), *Rodrique v. Hearst Commc'ns, Inc.,* No. CV 22-12152-RGS, 2024 WL 733325 (D. Mass. Feb. 22, 2024), and *Nelson-Godfrey v. Cook Cnty.*, 735 F. Supp. 3d 976 (N.D. Ill. 2024). Each of those cases involved accommodation claims, not intentional religious discrimination claims.

contends that Plaintiff has presented no evidence that similarly situated, non-Christian employees were treated more favorably than her. [113] at 13–14. Under *McDonell Douglas*, an employee is similarly situated when "he is directly comparable in all material aspects, including performance, qualifications, and conduct." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (citation omitted). The similarly situated inquiry is a flexible, common-sense one that asks whether "there are enough common factors ... to allow for a meaningful comparison in order to divine whether discrimination was at play." *Barricks v. Eli Lilly and Co.,* 481 F.3d 556, 560 (7th Cir.2007). A failure to identify similarly situated employees is fatal to a *McDonnell Douglas* claim. *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015).

There is no genuine dispute that all CFHC employees who engaged in similar conduct to Plaintiff—*i.e.*, refusing to receive a COVID-19 vaccine after CFHC decided it was no longer allowing accommodations—were also terminated. [114-7] at 31:1–7; [114-5] at 33:18–24. The only exceptions were Mahan and Laws, who continued their employment with CFHC on a consulting basis despite not having received a COVID-19 vaccine. [124] at 6. Mahan and Laws, however, were not similarly situated to Plaintiff. For one, they held different positions. *Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir.2001) (finding individuals holding different positions not similarly situated). Plaintiff was Director of Care Management, whereas Mahan was Senior Clinic Manager and Interim Chief Operating Officer and Laws was Director of Revenue Cycle. [114] ¶¶ 6, 49. But more

importantly, both Mahan and Laws held unique responsibilities within CFHC's organization. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (finding plaintiff not similarly situated to employees who had different job responsibilities). Mahan had deep knowledge of CFHC's operations. [114] ¶ 51. Laws was the only person who could navigate CFHC's financial records. *Id*. These responsibilities compelled CFHC to retain Mahan and Laws as consultants, as CFHC lacked anyone on staff who could take over their duties on such short notice. *Id*. ¶ 50. By contrast, others employed with CFHC knew what Plaintiff's role entailed. [114-5] at 37:18–38:1. These reasons make Mahan and Laws improper comparators.

Because there is no evidence of similarly situated employees who were treated more favorably than Plaintiff, Plaintiff has not established a *prima facie* case of religious discrimination, and the burden does not shift to CFHC. But even if the burden were to shift, CFHC has provided a legitimate, non-discriminatory reason for its adverse employment action, and Plaintiff has not submitted any evidence that CFHC's reason was pretextual.

"Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (quoting *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). If an employer "honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual." *See v. Illinois Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022); *see also Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020) ("In determining whether the

employer's reason can be characterized as pretextual, we do not evaluate whether the employer's proffered justification was accurate or even whether it was unfair. Our sole focus is on whether the employer's stated reason can be characterized as a falsehood rather than an honestly held belief.").

CFHC's proffered non-discriminatory reason for terminating Plaintiff is straightforward. In early 2022, CFHC decided it could no longer accommodate COVID-19 vaccine exemptions due to a surge in the Omicron variant. [114] ¶¶ 36, 39–40. CFHC notified its employees of this change and that employees would need to get vaccinated to continue their employment. *Id*. ¶ 44. When Plaintiff refused to get vaccinated, she was terminated. *Id*. ¶ 48. Plaintiff offers two reasons why CFHC's proffered reason was pretextual. She first contends that CFHC never told employees that the Omicron variant was the reason for rescinding their vaccine accommodations. [124] at 4. Standing alone, however, the fact that an employer does not fully explain to an employee why she is being fired let alone the reason for a change in a policy is not probative of pretext. *Juniel v. Park Forest-Chicago Heights Sch. Dist.* 163, 176 F. Supp. 2d 842, 853 (N.D. Ill. 2001) (a plaintiff "cannot raise a fact question on pretext by simply showing that [she] was not given a full explanation (or any explanation) of the reasons when [she] was fired.") (citation omitted). This is especially so where, as with here, there is no evidence that CFHC's proffered reason ever shifted. CFHC's reason at the time of Plaintiff's termination—that it could "no longer accommodate requests for any employees by allowing these employees to work onsite and engage with patients and other staff" [114-13] at 2—is consistent with

CFHC's position in litigation that, with the Omicron variant, having unvaccinated staff posed a greater risk to CFHC's operations, other staff, and patients. [113] at 4; *see Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) (explanations for termination "must actually be shifting and inconsistent to permit an inference of mendacity."). Plaintiff also contends that CFHC's decision to rescind her accommodation during the onset of the Omicron variant was entirely unnecessary, because during the Omicron era, there was no longer a significant risk to the population. [124] at 5. But disagreement over the necessity of the rescission does not establish that CFHC was lying to hide its true discriminatory intent. In other words, even if CFHC's decision to rescind Plaintiff's accommodation was "inaccurate, unfair, ... foolish, trivial, or baseless," that does not establish pretext so long as CFHC "honestly believed" in the non-discriminatory reason for Plaintiff's termination. *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (citation omitted). And here, Plaintiff has presented no evidence from which a reasonable jury could conclude that CFHC did not honestly believe it was terminating Plaintiff based on non-compliance with its revised COVID-19 vaccine requirements.

In sum, Plaintiff has not made a *prima facie* case of religious discrimination because there is no evidence of a similarly situated employee outside of her protected class who was treated better than her. And even if Plaintiff did make a *prima facie* case, Plaintiff provides no evidence that CFHC's decision to terminate her for her refusal to get a COVID-19 vaccine was pretextual. Plaintiff's religious discrimination

claim, therefore, cannot survive summary judgment by relying on the *McDonnell Douglas* framework.

### b. A Holistic Review Does Not Show Discrimination

Plaintiff fares no better on a holistic review of the evidence. In a holistic review, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765. But even taken as a whole, the evidence presented shows that it was Plaintiff's refusal to get a COVID-19 vaccine—not her Christianity or religious belief—that caused her termination. The Court finds no evidence, direct or circumstantial, suggesting that CFHC specifically targeted Christians (or religious individuals) when it decided to rescind employee vaccine accommodations. The evidence demonstrates that the rescission was applied evenly across all unvaccinated employees, regardless of religious affiliation. [114] ¶ 47. Plaintiff's religious discrimination claim, therefore, cannot survive summary judgment by relying on a holistic review of the evidence.

## II. Count II: Failure to Accommodate

Title VII failure to accommodate claims also follow a burden-shifting framework. To survive summary judgment, a plaintiff must make out a *prima facie* case by showing that: (1) her belief is religious in nature and conflicts with her employer's requirements; (2) she notified her employer of the religious belief; and (3) the need for a religious accommodation was the basis for the adverse employment decision. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013); *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 712 (7th Cir. 2021). If the plaintiff can

15

establish a *prima facie* case, the burden shifts to the employer to show that any reasonable accommodation would have caused an undue hardship. *Adeyeye*, 721 F.3d at 449.

CFHC challenges two aspects of Plaintiff's failure to accommodate claim. It first argues that Plaintiff cannot identify any religious belief that prohibited her from receiving a COVID-19 vaccine and therefore cannot establish a *prima facie* case for failure to accommodate. Additionally, CFHC asserts that even if Plaintiff could establish a *prima facie* case, Plaintiff's accommodation request would have imposed an undue hardship on CFHC. The Court addresses each of CFHC's arguments in turn.

### a. A Genuine Dispute of Fact Exists as to the Nature of Plaintiff's Religious Belief

To demonstrate that her belief was religious in nature, an employee must present evidence that would permit a reasonable jury to find that "(1) the belief for which protection is sought is religious in [the employee's] own scheme of things and (2) that it is sincerely held." *Kluge v. Brownsburg Cmty. Sch. Corp.* (*Kluge II*), 150 F.4th 792, 811 (7th Cir. 2025) (cleaned up). Employees carry a "low burden" to establish that they hold certain religious beliefs. *Id*. This is because courts do not have expertise "to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy" and generally "should avoid putting themselves in the impossible position of trying to define religious legitimacy and viewpoint sufficiency." *Id*. (citations omitted).

16

CFHC contends that Plaintiff has not articulated a religious belief that prevented her from receiving the COVID-19 vaccine. [113] at 9. A belief is religious if it "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Adeyeye*, 721 F.3d at 448 (quoting *United States v. Seeger*, 380 U.S. 163, 165–66 (1965)). Such beliefs "deal[ ] with issues of ultimate concern," like "matters of the afterlife, spirituality, or the soul, among other possibilities." *Id.* (citation omitted).

Viewed in a light most favorable to Plaintiff, there is sufficient evidence that would permit a reasonable jury to find that Plaintiff's objection to receiving a COVID-19 vaccine was based on a religious belief. During her deposition, Plaintiff testified that "injecting or allowing someone to inject something foreign into me to prevent me from possibly not catching something" would be contrary to her belief that God was her "healer" and "protector." [114-3] at 43:3–14. Based on this, a reasonably jury could infer that Plaintiff believed that God, not vaccines, should ultimately be in charge of healing her body. A belief concerning the appropriate role of God in one's life is an "issue[] of ultimate concern." *Adeyeye*, 721 F.3d at 448. And by obligating Plaintiff to take a vaccine as a condition of her employment, CFHC was essentially asking Plaintiff to go against that belief.

CFHC's assertions to the contrary are unpersuasive. CFHC, for instance, relies heavily on the fact that Plaintiff never identified a specific observance or practice that prevented her from getting a COVID-19 vaccine. [113] at 10; [130] at 9. The Seventh Circuit, however, has explained that courts "should not undertake to dissect religious beliefs because … [those] beliefs are not articulated with the clarity and precision

that a more sophisticated person might employ." *Adeyeye*, 721 F.3d at 452 (citing *Thomas v. Review Bd. of Indiana Employment Sec. Division,* 450 U.S. 707, 715 (1981)). So, while Plaintiff could have done more to explain the basis of her religious belief, it is not this Court's role to fault Plaintiff for not doing so. Plaintiff sufficiently put forth her belief that God was her "healer" in her initial accommodation request, [114-11] at 2, and maintained that position in her deposition. [114-3] at 43:3–6. That is enough to survive summary judgment. Additionally, CFHC faults Plaintiff for opposing the COVID-19 vaccine on safety and medical grounds. [130] at 8. Yet on this point too, the Seventh Circuit has explained that a religious belief need not be the only reason behind a plaintiff's objection to an employer's demand, so long as the employee's objection is in part based upon a religious belief. *Passarella v. Aspirus, Inc.*, 108 F.4th 1005, 1011 (7th Cir. 2024) ("a 'religious' objection can sound in *both* religious and non-religious terms.") (emphasis in original). So even if Plaintiff also opposed COVID-19 vaccines on safety and medical grounds, her declared opposition based on religious beliefs keeps alive her failure to accommodate claim.

Finally, the Court acknowledges CFHC's reliance on *McCadd v. Kraft Heinz Co.*, No. 22-CV-07096, 2025 WL 660812 (N.D. Ill. Feb. 28, 2025) but finds *McCadd* factually distinct from the situation here. In *McCadd*, the plaintiff's objection to receiving a COVID-19 vaccine was based on her belief that her "body is a temple of God and the Holy Spirit" and she could not "defile" it by ingesting certain substances. *Id*. at *2. Based on this, the *McCadd* court found that plaintiff's refusal to receive a COVID-19 vaccine was ultimately a concern about harm to her body, which was a

medical belief, not a religious one. *Id.* at *4. While Plaintiff's accommodation request here made similar statements about her body being a "temple," [114] ¶ 25, she also put forth her belief in God's role as the healer in her life. A reasonable jury could find that this is a religious, not medical, belief.

To be sure, the Court shares CFHC's worries that Plaintiff cannot simply use her Christian faith to transform unprotected medical concerns into religious concerns protected by Title VII. The *McCadd* court expressed those worries too. *McCadd*, 2025 WL 660812, at *4 ("To accept Plaintiff's beliefs as 'religious' would give her the unfettered ability to claim a violation of religious beliefs whenever she did not want to comply with an employer's mandatory policy."). Nevertheless, the Seventh Circuit has made clear that it is not a court's job to "probe and perhaps even to disapprove of the content of [a plaintiff's] religious beliefs." *Adeyeye*, 721 F.3d at 454. So, while Plaintiff's religious objection may appear overly broad to some, if Plaintiff truly believed that God is her healer, it is not this Court's role to question that. Of course, CFHC will have the opportunity to examine the sincerity of such a far-reaching belief. But issues related to sincerity are proper for trial, not summary judgment. *See e.g., EEOC v. Ilona of Hung., Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (determining whether a belief is sincerely held "generally will depend on [an] assessment of the employee's credibility"); *EEOC v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 56 (1st Cir. 2002) ("Credibility issues such as the sincerity of an employee's religious belief are quintessential fact

questions. As such, they ordinarily should be reserved for the factfinder at trial, not for the court at summary judgment.") (citation omitted).

In sum, there is enough evidence for a reasonable jury to infer that Plaintiff held a religious belief that prevented her from receiving a COVID-19 vaccine. The Court therefore cannot grant CFHC summary judgment on this basis.

### b. A Genuine Dispute of Fact Exists as to Whether Any Accommodation Would Have Imposed an Undue Hardship on CFHC

"Absent a reasonable accommodation," an employer is "required to demonstrate that any accommodation would have caused it undue hardship." *Ilona*, 108 F.3d at 1576. An accommodation imposes an undue hardship on an employer when the "hardship would be substantial in the context of [the] employer's business." *Groff v. DeJoy*, 600 U.S. 447, 471 (2023). This inquiry is highly "fact specific," and courts must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Kluge II*, 150 F.4th at 803 (quoting *Groff*, 600 U.S. at 470–71). An employer ultimately bears the burden showing "that any and all accommodations would have imposed an undue hardship." *Adeyeye*, 721 F.3d at 455.

CFHC concedes that a "possible accommodation that would [have] protect[ed] an unvaccinated Plaintiff and CFHC operations was to allow [Plaintiff] to work completely remote." [113] at 7. But CFHC argues that this accommodation would have imposed an undue hardship on its operations due to Plaintiff's managerial position. *Id*. at 7–8. In support, CFHC points to the following testimony from

Christine Spring ("Spring"), former Senior Director of Human Resources and Chief Financial Officer at CFHC, and Dr. Susan Oyetunde ("Dr. Oyetunde"), former Chief Medical Officer at CFHC:

> Q [H]ow necessary [was it] for [Plaintiff] to appear in person or --at any, you know, at any point? I mean, [was] this a job that could be done completely remotely?
> A No. [It] would require some level of onsite presence.
>
> Q And for what reason?
> A Because [Plaintiff] had many staff directly reporting to her. So, for support of those staff and various meetings, it was necessary to interact directly with staff.
>
> …
>
> Q Could [Plaintiff] not have performed her duties through video, phone meetings, email?
> A She could have performed some of the duties. But I don't know anyone that would agree with that being as effective as availability onsite and in person.

[114-5] at 12:24–13-9; 42:19–24;

> Q When [Plaintiff] received the religious accommodation for the vaccine, did this in any way cause a hardship for the company?
> A I would say yes.
>
> Q In what way?
> A [Plaintiff] was part of management and all management members were expected to have some presence onsite.

[114-7] at 36:12–19.

This evidence, however, fails to demonstrate *why* allowing Plaintiff to work fully remotely would have imposed "substantial [hardship] in the context of [CFHC's] business." *Groff*, 600 U.S. at 471. Was it because fully remote work would have led to significantly worse patient outcomes? Was it because it would have created insurmountable communication barriers between Plaintiff and her staff? CFHC

offers little specifics. At most[3], CFHC's evidence suggests that Plaintiff would not have been as "effective" in a fully remote role. Standing alone, this is insufficient to establish that "granting [Plaintiff] an accommodation would [have] result[ed] in *substantial increased costs* in relation to the conduct of [CFHC's] business." *Id.* at 470 (emphasis added). Plaintiff, moreover, provided testimony indicating that she could have effectively performed her job completely remotely:

> Q [H]ow did your accommodations affect how you carried out your job duties?
> A They didn't impact.
>
> Q So when you were in the office, did you perform your job duties the exact same way as you would if you were at home?
> A Yes.
>
> Q [W]hen you were in the office, [] did you meet one-on-one with staff?
> A …Yes, sometimes.
>
> Q Okay. And that's something that you weren't able to do if you were completely remote; correct?
> A No. That's not correct. I could meet with staff on video like I would do when I would work from home.
>
> Q Okay. But you wouldn't be able to meet with them in person?
> A No. Not if I wasn't on site at the facility. But [] if I wasn't there, that didn't stop me from meeting them via phone or via video…my role as the director of care management was to be concerned with my department and the patients that we serve. So I was able to monitor their activity, i.e., the operations of the department, via dashboard and via phone…

---

[3]The other potential explanation CFHC offered is that fully remote work was prohibited for "equity" reasons. [114-5] at 42:10–12; 43:19–44:13. As applied to Plaintiff, this reasoning essentially claims that other employees would resent Plaintiff's religious accommodation. The Supreme Court, however, has rejected this rationale as a basis for claiming undue hardship. *Groff*, 600 U.S. at 472 ("a hardship that is attributable to employee animosity to … the very notion of accommodating religious practice cannot be considered 'undue.'").

Q And when you said you would monitor the staff that you managed, would that ever take place in person? Would you ever monitor them when you were at the location?

A Oh, yeah. I could do that too. But monitoring them, I could go and sit down next to one of my team members and put a headphone on, or I could be in my office and just click and get in on the – 'cause our calls always say, "This call may be monitored," blah blah, blah, blah.

[114-3] at 55:16–58:2.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury that credited Plaintiff's testimony and discredited Spring and Dr. Oyetunde's testimony could infer that Plaintiff's managerial role was fully compatible with remote work. Further bolstering this inference is the fact that Plaintiff was already working a hybrid schedule before the Omicron variant and her job involved no patient interactions, the latter of which would presumably require some in-person interaction. [114] ¶ 15; [114-5] at 13:10–12.

In sum, there is genuine dispute of fact as to whether letting Plaintiff work fully remote would have imposed an undue hardship on CFHC[4]. The Court therefore cannot grant summary judgment on this basis either.

## CONCLUSION

---

[4]The parties also dispute whether continuing Plaintiff's original accommodation (*i.e.*, a hybrid schedule with weekly COVID-19 testing, PPE, and social distancing) would have imposed an undue hardship on CFHC. As there a genuine dispute as to the burden of allowing Plaintiff to work fully remote, the Court need not take a position this other accommodation. *See Adeyeye*, 721 F.3d at 455 (an employer must show "that *any and all* accommodations would have imposed an undue hardship.") (emphasis added).

23

For the stated reasons, CFHC's motion for summary judgment [112] is granted-in-part. Summary judgment is granted as to Count I. Summary judgment is denied as to Count II.

E N T E R:

Dated: March 5, 2026

MARY M. ROWLAND
United States District Judge